# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**WILBERT VAN BUREN**                                        **CIVIL ACTION**

**versus**                                                  **NO. 12-1578**

**N. BURL CAIN, WARDEN**                                    **SECTION: "C" (1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Wilbert Van Buren,[1] is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana. On October 10, 2007, he was convicted of manslaughter under

---

[1] Petitioner's surname appears in the record as "Van Buren," "VanBuren," and "Vanburen." It is unclear which is correct.

Louisiana law.[2]  On October 17, 2007, he was found to be a third offender and was sentenced as such to a term of eighty years imprisonment without benefit of probation or suspension of sentence.[3] The Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence on March 11, 2009.[4]  The Louisiana Supreme Court then denied his related writ application on December 11, 2009.[5]

On October 18, 2010, petitioner filed an application for post-conviction relief with the state district court.[6]  That application was denied on October 25, 2010;[7] however, on December 23, 2010, the Louisiana Fourth Circuit Court of Appeal granted his related writ application and remanded the matter for further proceedings.[8]  The state district court then again denied relief on January 19, 2011.[9]  His related writ applications were likewise denied by the Louisiana Fourth

---

[2] State Rec., Vol. I of III, minute entry dated October 10, 2007; State Rec.,Vol. I of III, jury verdict form.

[3] State Rec., Vol. I of III, minute entry dated October 17, 2007.

[4] State v. Van Buren, No. 2008-KA-0534, 2009 WL 8684645 (La. App. 4th Cir. Mar. 11, 2009); State Rec., Vol. I of III.

[5] State v. Van Buren, 23 So.3d 913 (La. 2009) (No. 2009-K-0823); State Rec., Vol. III of III.

[6] State Rec., Vol. I of III.

[7] State Rec., Vol. I of III, Judgment dated October 25, 2010; see also State Rec., Vol. I of III, minute entry dated November 9, 2010.

[8] State v. Vanburen, No. 2010-K-1722 (La. App. 4th Cir. Dec. 23, 2010); State Rec., Vol. I of III.

[9] State Rec., Vol. I of III, Judgment dated January 19, 2011.

Circuit Court of Appeal on March 23, 2011,[10] and by the Louisiana Supreme Court on March 23, 2012.[11]

On June 12, 2012, petitioner filed the instant federal application for *habeas corpus* relief.[12] The state concedes that the federal application is timely and that petitioner exhausted his remedies in the state courts.

## I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application

---

[10] State v. Vanburen, No. 2011-K-0290 (La. App. 4th Cir. Mar. 23, 2011); State Rec., Vol. III of III.

[11] State *ex rel.* Vanburen v. State, 84 So.3d 563 (La. 2012) (No. 2011-KH-0876); State Rec., Vol. III of III.

[12] Rec. Doc. 1.

for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways. First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Court's cases but unreasonably applies it to the
> facts of the particular state prisoner's case. Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

Williams v. Taylor, 529 U.S. 362, 407 (2000). The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in Williams that an unreasonable application is different from an

incorrect one." Bell, 535 U.S. at 694; see also Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011)

("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."),

cert. denied, 132 S.Ct. 1537 (2012).

While the AEDPA standards of review are strict and narrow, they are purposely so.

As the United States Supreme Court recently held:

> [E]ven a strong case for relief does not mean the state court's
> contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was
> meant to be. As amended by AEDPA, § 2254(d) stops short of
> imposing a complete bar on federal court relitigation of claims
> already rejected in state proceedings. It preserves authority to issue
> the writ in cases where there is *no possibility* fairminded jurists could
> disagree that the state court's decision conflicts with this Court's
> precedents. It goes no farther. Section 2254(d) reflects the view that
> habeas corpus is a guard against *extreme malfunctions* in the state
> criminal justice systems, *not a substitute for ordinary error
> correction through appeal*. *As a condition for obtaining habeas*

*corpus from a federal court, a state prisoner must show that the state*
*court's ruling on the claim being presented in federal court was so*
*lacking in justification that there was an error well understood and*
*comprehended in existing law beyond any possibility for fairminded*
*disagreement.*

<u>Harrington v. Richter</u>, 131 S.Ct. 770, 786-87 (2011) (citations omitted; emphasis added).

II.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts

of this case as follows:

> Defendant was indicted, tried and convicted for the shooting death of Eric McCormick on November 20, 2006.  At trial, seven witnesses testified for the prosecution:  one expert in forensic pathology and six fact witnesses, including the victim's sister, uncle, aunt, a bystander who witnessed the event, and two investigating police officers.
>
> Dr. Paul McGarry, who was qualified by stipulation as an expert in the field of forensic pathology, autopsied the victim on November 21, 2006.  Dr. McGarry testified that the victim had sustained two gunshot wounds from .38 caliber bullets.  One bullet had entered the upper left arm, approximately five inches below the shoulder and had struck the bone of the arm, stopping there.  This wound was not fatal.  The second bullet had entered the chest under the victim's left arm, gone across his chest, struck his spine, gone through his left lung, and had lodged in his left pleural/chest cavity.  This second wound was fatal and had caused death in a matter of minutes.  Dr. McGarry also identified two bullets recovered by him during the autopsy.
>
> Dr. McGarry testified on cross examination that the fatal wound was such that the left arm could not have been hanging at rest in the "neutral" position.  He said the shooter had been a few feet to a few yards away from the victim.  The victim's left side had been facing the shooter, but Dr. McGarry could not say whether the victim had been leaning back, leaning forward, moving, or standing still.
>
> Twenty-four-year old Kenosha McCormick, the victim's sister, testified that on the day her brother died she had given him a ride to the 2600 block of Dumaine Street, where some family

members lived.  She also had observed defendant, who was a friend of hers and who knew her brother, in that block on that day.

Fifty-year-old Joseph Nixon III, the victim's uncle by marriage, testified that he knew defendant by the moniker "Man." Mr. Nixon related that on the day of the shooting, he was sitting on the porch at 2631 Dumaine Street while the victim and defendant were shooting dice in front of 2641 Dumaine Street.  Mr. Nixon observed defendant and the victim get into a fist fight that then moved into the street.  The victim won the fight, at which point defendant left on a bicycle, got a gun, and came back.  Defendant then got off his bicycle, walked to the corner, walked back, saw the victim emerging from an alley alongside 2641 Dumaine, and shot him.  The shooting happened during the afternoon.  Nothing was blocking Mr. Nixon's view of the shooting.  He said defendant was armed with a black 9 mm or Glock handgun.  Mr. Nixon heard five shots; he said the victim was struck in the side and the leg.  After witnessing the shooting, Mr. Nixon identified defendant's photo in a lineup presented to him by police.  In addition, Mr. Nixon admitted that he had pled guilty to possession of crack cocaine in 1992, and that he had been drinking a can of beer while sitting on the porch the day of the shooting.

Forty-nine-year-old Yacanette Nixon, the victim's aunt by marriage, testified that at the time of the shooting, she was standing in the doorway of 2631 Dumaine Street.  She knew defendant by the moniker "Nephew."  Defendant and the victim, and perhaps some others, were shooting dice.  A fight broke out between the victim and defendant.  After the fight defendant said something to the effect that he would be back.  Defendant rode off on a bicycle and returned, riding slowly.  Still standing in the doorway, Ms. Nixon heard the shots but could not see the victim from her vantage point because he was in an alley.  Hearing the shots caused her to duck back inside and close the door.  She subsequently opened the door and saw the victim by the curb.  He told her he had been shot, and he asked her to call the police.  Ms. Nixon subsequently identified defendant in a photographic lineup as the person she had seen threaten the victim, and she identified him in court.

Ms. Nixon admitted to having two prior convictions involving crack cocaine and one conviction for manslaughter, the latter conviction for which she had served five years in prison.  Under cross examination, she stated that she had been arrested on March 3, 2007 for illegally carrying a weapon, possession of crack cocaine, and possession of drug paraphernalia.  She had been released from jail on

those charges because the District Attorney's Office had not timely charged her. She also admitted that she had been arrested on or about April 27, 2007 for possession of crack cocaine, but did not know the status of that charge.

Forty-six-year-old Robin Pruett testified that on November 20, 2006 she was overseeing some men moving furniture into 2654 Dumaine Street. She observed a dice game at some point. She saw a fist fight between two males, with one getting beaten in the face really badly. Other males broke up the fight. The loser started to walk away, but turned around and came back to get his bicycle. The loser said that it wasn't over yet, that he would be back, that he "had something for" his opponent. Pruett identified defendant in court as that person. She said she also had identified the person in a photo lineup presented to her by a police detective. Pruett said she did not observe the shooting because she left shortly after the fight ended to get some more furniture, and by the time she returned, the police were on the scene. Pruett confirmed on cross examination that there had been twenty or thirty people on the street the day of the shooting. Pruett was confronted with her testimony from a prior hearing indicating that when viewing the photo lineup, she had said: "You know, could this be him but maybe he's a little bit older and a little bit thinner?"

New Orleans Police Department Detective Sergeant Nichole Barbé testified that she investigated the shooting in the instant case. As a result of her investigation, she developed defendant as a suspect and learned that he resided in the Iberville Housing Project. Det. Barbé interviewed Robin Pruett the day following the shooting, and that evening she showed Ms. Pruett a photo lineup in which Pruett selected defendant's photograph. In January 2007 Det. Barbé and another detective located defendant at a house trailer on Haynes Boulevard. When Det. Barbé asked defendant his name, he replied, "Jonathan Barrow." Defendant agreed to accompany the detectives to their office. During the ride Det. Barbé asked defendant where he had been living or staying. He replied that he had been staying with a sister in Tennessee for the past several months, but he could not remember where that had been. Nor could defendant provide the detectives with his sister's telephone number or tell them some other way to get in touch with her to verify that he had been staying with her. Defendant continued to maintain that his name was Jonathan Barrow. When the detectives returned to their office, another police officer asked defendant what his name was, and he admitted that it was Wilbert Van Buren. Asked why he had lied, defendant explained

that he thought he had some open municipal attachments. Det. Barbé said she then arrested defendant for the murder of Eric McCormack, the victim in the instant case.

Det. Barbé later determined there had been no municipal attachment for defendant. Det. Barbé interviewed Yacanette Nixon after defendant's arrest. Ms. Nixon identified defendant in a photographic lineup. Det. Barbé testified that Ms. Nixon told her that when defendant had ridden his bicycle back onto the scene, the victim had jumped up to go and fight him again, but Ms. Nixon had told her nephew not to, that it was not worth it.

New Orleans Police Detective Decynda Barnes testified that on March 6, 2007, she obtained a formal taped statement from Joseph Nixon and showed him a photo lineup containing defendant's photo. Det. Barnes confirmed on cross examination that March 6, 2007 was approximately three and one-half months after the homicide in question.[13]

### III.  Petitioner's Claims

#### A.  Unavailability of Transcript/Denial of Continuance

Petitioner's first claim is that the trial court erred by failing to provide a transcript of the preliminary hearing and in denying a related defense motion for a continuance.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> In his first assignment of error, defendant argues that: (1) he was deprived of a meaningful opportunity to impeach the State's witnesses for lack of a transcript of the preliminary hearing, "the recording of which was irretrievably lost because of technical difficulties;" and (2) that the trial court erred in denying him a continuance so his attorneys could reevaluate their strategy.
>
> Defendant asserts that on February 15, 2007, prior to indictment, a preliminary hearing was held, and that on March 20, 2007, his OIDP staff attorney submitted a written request for a transcript of the preliminary hearing.  According to defendant's appellate brief, his counsel received no response to this request until October 4, 2007, when the court reporter left a telephone message

---

[13]  <u>Van Buren</u>, 2009 WL 8684645, at *1-3; State Rec., Vol. I of III.

stating that the audio recording of the hearing could not be retrieved and that she could not find her notes. Defendant asserts that his trial counsel then moved for a continuance to reevaluate trial strategy, which was denied. The record confirms that a motion for continuance was filed on October 5, 2007 and denied over the telephone by the presiding judge the same day, and that this court denied defendant's emergency writ application on the issue.[FN1] The record further reflects that defense counsel noted an objection for the record at an October 9, 2007 motion hearing.

> [FN1]  State v. Van Buren, unpub., 2007-1289 (La.App. 4 Cir. 10/5/07) ("The relator has an adequate remedy on appeal.").

La.C.Cr.P. art. 843 provides that in felony cases, the clerk or court stenographer shall record all of the proceedings. Upon motion by the defendant a transcript of the preliminary examination may be made. La.C.Cr.P. art. 294(D). The transcript of the testimony of a witness given at a preliminary examination may be used by any party in a subsequent judicial proceeding for the purpose of impeaching or contradicting the testimony of such witness. La. C.Cr.P. art. 295(C).

This court has held that the defendant in a criminal proceeding has a statutory right to a transcript of the preliminary hearing in his prosecution; however, the failure to provide the defendant with such preliminary hearing transcript does not constitute reversible error absent a showing that his cross-examination and impeachment of the State's witnesses were hampered at trial. State v. Nelson, 562 So.2d 1076, 1078 (La.App. 4 Cir. 1990) (citing State v. Benson, 368 So.2d 716 (La. 1979) and State v. Allen, 276 So.2d 868 (La. 1973)).

In the instant case, the record reflects that Det. Nicole Barbé testified at the defendant's February 15, 2007 preliminary hearing. Det. Barbé, who was the primary law enforcement officer to testify at defendant's trial, also testified at an April 20, 2007 motion hearing, as reflected by the transcript of that hearing that is contained in the record. Defendant's trial counsel obviously had access to a transcript of that motion hearing, because during the trial he cross examined two of the State's lay witnesses, Robin Pruett and Joseph Nixon, as to their prior testimony given at the motion hearing. Thus, defendant's trial counsel also had access to the prior testimony Det. Barbé gave during that same motion hearing.

There is no indication that defense counsel's cross examination of any of the State's witnesses was hampered in any way by his trial counsel's inability to obtain the preliminary hearing transcript. Therefore, we conclude that defendant has failed to show he was prejudiced by the denial of his motion for a continuance.

Generally, a timely-filed motion for continuance may be granted, in the discretion of the trial court, if there is good ground therefore. La.C.Cr.P. art. 712. In State v. Snyder, 98-1078 (La. 4/14/99), 750 So.2d 832, reversed on other grounds, Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), the court stated:

> As a general matter, the decision to grant or deny a motion for continuance rests within the sound discretion of the trial judge, and a reviewing court will not disturb a trial court's determination absent a clear abuse of discretion. La.C.Cr.P. art. 712; State v. Strickland, 94-0025, p. 23 (La. 11/1/96), 683 So.2d 218, 229; State v. Bourque, 622 So.2d 198, 224 (La. 1993), overruled on other grounds by State v. Comeaux, 93-2729 (La. 7/1/97), 699 So.2d 16. Whether a refusal to grant a continuance was justified depends on the circumstances of the particular case presented. State v. Bourque, 622 So.2d at 224; State v. Simpson, 403 So.2d 1214, 1216 (La. 1981). Generally, this court declines to reverse convictions for improper denial of a motion to continue absent a showing of specific prejudice. State v. Strickland, 94-0025 at p. 23, 683 So.2d at 229; State v. Gaskin, 412 So.2d 1007, 1011 (La. 1982).

98-1078 at p. 22, 750 So.2d at 849.

Considering the facts and circumstances in the instant case, we cannot say that the trial court abused its discretion by denying the motion to continue. Moreover, even assuming that the trial court had abused its discretion by denying the motion, we would have found it to be harmless error because the guilty verdict rendered in the instant case was surely unattributable to any such error. See State v. Castleberry, 98-1388, p. 23 (La. 4/13/99), 758 So.2d 749, 768-769.

We therefore reject this assignment of error.[14]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[15]

As a preliminary matter, it is noted that the state courts analyzed this claim under only state law, and petitioner cites primarily state law in the discussion of this claim in his federal application. However, whether state law was violated is of no moment in this federal proceeding. Federal *habeas corpus* relief is available only for violations of federal constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, this Court need not, and does not, determine whether petitioner's rights under state law have been violated.

To the extent that petitioner is claiming that the unavailability of the transcript violated his rights under *federal* law, this Court rejects that contention for the following reasons.

As an initial matter, the Court notes that the state references Britt v. North Carolina, 404 U.S. 226, 227 (1971), in its response in this proceeding. However, as the state appears to recognize, Britt is inapposite. In Britt, the United States Supreme Court noted:

> Griffin v. Illinois[, 351 U.S. 12 (1956),] and its progeny establish the principle that the State must, *as a matter of equal protection*, provide indigent prisoners with the basic tools of an adequate defense or appeal, *when those tools are available for a price to other prisoners*. While the outer limits of that principle are not clear, there can be no doubt that the State must provide an indigent

---

[14] Van Buren, 2009 WL 8684645, at *3-4; State Rec., Vol. I of III.

[15] State v. Van Buren, 23 So.3d 913 (La. 2009) (No. 2009-K-0823); State Rec., Vol. III of III.

> defendant with a transcript of prior proceedings when that transcript
> is needed for an effective defense or appeal.

Britt, 404 U.S. at 227 (emphasis added). In this case, petitioner was not denied a copy of an otherwise available transcript due to his indigence; here, the transcript was not available to *anyone* at any price because the court reporter had neither the recording of the proceedings nor her notes. Therefore, the Equal Protection Clause simply is not implicated by petitioner's claim.

Further, this is not a case in which an existing document was denied to a criminal defendant in bad faith or even in an exercise of discretion; rather, as noted, this is case in which it was *impossible* for the state to provide the transcript. Therefore, while the preliminary hearing transcript *might*, at least hypothetically, have proven useful at trial for impeachment purposes, the state's inability to provide it was unfortunate but not necessarily *unconstitutional*. The Constitution simply does not require a state to do that which is impossible, and it cannot reasonably be contended that a state's completely unintentional inability to provide a criminal defendant with a copy of a preliminary hearing transcript forever precludes a defendant from being brought to trial. Cf. United States *ex rel.* Smart v. Pate, 318 F.2d 559, 562 (7th Cir. 1963) ("Even if we concede that the absence of any part of the transcript might hamper Smart in an attempt to secure a review of his conviction, it cannot be rationally contended that the Fourteenth Amendment has ever been construed as a complete insulation against the 'slings and arrows of outrageous fortune', which may strike anyone at any time and are unfortunately incidental to life itself. ... [T]he Fourteenth Amendment does not require the performance of the impossible.").

Moreover, petitioner's related claim that his rights were violated by the denial of a continuance fares no better. In a federal *habeas corpus* proceeding in which a petitioner claims that

relief is warranted due to the denial of a continuance, he must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate the constitutional principles of due process. <u>See Newton v. Dretke</u>, 371 F.3d 250, 255 (5th Cir. 2004). As a result, an abuse of discretion alone is not sufficient to warrant *habeas corpus* relief; rather, a petitioner must also establish that actual prejudice resulted by showing that there is a reasonable probability that the verdict might have been different had the continuance been granted. <u>See</u> <u>Schrader v. Whitley</u>, 904 F.2d 282, 288 (5th Cir. 1990) ("If abuse of discretion is demonstrated, the petitioner must sustain the burden common to due process claims that there is a reasonable probability that the verdict might have been different had the trial been properly conducted ...." (internal quotation marks omitted)).

Even if petitioner could establish an abuse of discretion in the instant case, which is doubtful at best, he clearly cannot show resulting prejudice. Defense counsel apparently requested the continuance for the vague reason that he wanted to "reevaluate" his trial strategy in light of the fact that the preliminary hearing transcript was not available. However, there is no reason whatsoever to believe that the preliminary hearing transcript would actually have proved valuable for impeachment purposes, that the defense strategy was ever based in any measure on the availability of that transcript, or that a different strategy would in fact have been employed if a continuance had been granted. In light of those considerations, as well as the overwhelming evidence of petitioner's guilt, there is simply no reasonable probability that the verdict here would have been different had the trial been delayed.

<u>B. Excessive Sentence</u>

Petitioner also claims that his sentence is excessive. On direct appeal, the Louisiana

Fourth Circuit Court of Appeal rejected that claim, holding:

> In his second assignment of error, defendant argues that his sentence is unconstitutionally excessive. At the conclusion of sentencing the trial court denied defendant's motion to reconsider sentence, and noted an objection on behalf of the defendant to the sentence imposed, thus preserving defendant's right under La.C.Cr.P art. 881.1 and La.C.Cr.P. art. 881.2 to seek review of the sentence based on the issue of excessiveness. See <u>State v. Dunbar</u>, 2006-1030, p. 3 (La.App. 4 Cir. 3/19/08), 981 So.2d 51, 53.
>
> Defendant was convicted of manslaughter, a violation of La. R.S. 14:31, which provides for a sentence of imprisonment at hard labor for not more than forty years, providing that the victim is ten years of age or older, as in the instant case. Defendant was adjudicated a third-felony habitual offender and sentenced by the trial court, pursuant to La. R.S. 15:529.1(A)(b)(i), to eighty years at hard labor – without benefit of probation or suspension of sentence, as stipulated by La. R.S. 15:529.1(G).
>
> La. R.S. 15: 529. 1(A)(b)(i) states that a third felony offender convicted of the types of felony offenses for which defendant in the instant case was convicted shall be sentenced to imprisonment for a determinate term not less than two-thirds of the longest possible sentence for the instant conviction – in this case, manslaughter – and not more than twice the longest possible sentence prescribed for a first conviction.
>
> Thus, in the instant case defendant, who was twenty-three years old at the time he shot and killed the victim in this case, legally could have been sentenced to imprisonment for not less than twenty-six and two-thirds years, and not more than eighty years. He was sentenced to the maximum term allowable under law, eighty years. Pursuant to La. R.S. 15:529.1(G), defendant's sentence is without the benefit of probation or suspension of sentence. Although defendant is eligible for parole, he will not be eligible for parole until he has served at least eighty-five percent of his eighty-year sentence, or sixty-eight years because manslaughter is listed as a crime of violence under La. R.S. 14:2. See La. R.S. 15:574.4(B).[FN2]

> [FN2] La. R.S. 15:574.4(B) states, in pertinent part:

Notwithstanding any other provisions of law to the contrary, a person convicted of a crime of violence and not otherwise ineligible for parole shall serve at least eighty-five percent of the sentence imposed, before being eligible for parole.

La. Const. art. I, § 20 explicitly prohibits excessive sentences. State v. Baxley, 94-2982, p. 4, (La. 5/22/95), 656 So.2d 973, 977. Although a sentence is within the statutory limits, the sentence may still violate a defendant's constitutional right against excessive punishment. State v. Brady, 97-1095, p. 17 (La.App. 4 Cir. 2/3/99), 727 So.2d 1264, 1272, rehearing granted on other grounds, (La.App. 4 Cir. 3/16/99); State v. Francis, 96-2389, p. 6 (La.App. 4 Cir. 4/15/98), 715 So.2d 457, 461, grant of post conviction relief on other grounds affirmed, 2001-1667 (La.App. 4 Cir. 2/6/02), 809 So.2d 1132. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. Baxley, 94-2984 at p. 10, 656 So.2d at 979, citing State v. Ryans, 513 So.2d 386, 387 (La.App. 4 Cir. 1987). A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Johnson, 97-1906, pp. 6–7 (La. 3/4/98), 709 So.2d 672, 677; State v. Webster, 98-0807, p. 3 (La.App. 4 Cir. 11/10/99), 746 So.2d 799, 801, reversed on other grounds, State v. Lindsey, 99-3256 (La. 10/17/00), 770 So.2d 339. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. Baxley, 94-2984 at p. 9, 656 So.2d at 979; State v. Hills, 98-0507, p. 5 (La.App. 4 Cir. 1/20/99), 727 So.2d 1215, 1217.

In reviewing a claim that a sentence is excessive, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La.C.Cr.P. art. 894.1, and whether the sentence is warranted under the facts established by the record. State v. Trepagnier, 97-2427, p. 11 (La.App. 4 Cir. 9/15/99), 744 So.2d 181, 189; State v. Robinson, 98-1606, p. 12 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 127. If adequate compliance with La.C.Cr.P. art. 894.1 is found, the reviewing court must determine whether the sentence imposed is too severe in light of the particular

defendant and the circumstances of the case, keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged. State v. Ross, 98-0283, p. 8 (La.App. 4 Cir. 9/8/99), 743 So.2d 757, 762; State v. Bonicard, 98-0665, p. 3 (La.App. 4 Cir. 8/4/99), 752 So.2d 184, 185.

However, in State v. Major, 96-1214 (La.App. 4 Cir. 3/4/98), 708 So.2d 813, this court stated:

> The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resentencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La. 1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).

96-1214 at p. 10, 708 So.2d at 819.

In State v. Soraporu, 97-1027 (La. 10/13/97), 703 So.2d 608, the Louisiana Supreme Court stated:

> On appellate review of sentence, the only relevant question is "'whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.'" State v. Cook, 95-2784, p. 3 (La. 5/31/96), 674 So.2d 957, 959 (quoting State v. Humphrey, 445 So.2d 1155, 1165 (La. 1984)), cert. denied, ___ U.S. ___, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996). For legal sentences imposed within the range provided by the legislature, a trial court abuses its discretion only when it contravenes the prohibition of excessive punishment in La. Const. art. I, § 20, i.e., when it imposes "punishment disproportionate to the offense." State v. Sepulvado, 367 So.2d 762, 767 (La. 1979). In cases in which the trial court has left a less than fully articulated record indicating that it has considered not only aggravating circumstances but also factors militating for a less severe sentence, State v. Franks, 373 So.2d 1307, 1308 (La. 1979), a remand for resentencing is

appropriate only when "there appear[s] to be a substantial possibility that the defendant's complaints of an excessive sentence ha[ve] merit." State v. Wimberly, 414 So.2d 666, 672 (La. 1982).

In the instant case, the trial court expounded on senseless killings in general, and the killing in the instant case in particular, before pronouncing sentence on defendant. The trial court's reasons for sentencing accounted for ten pages of the sentencing transcript.

The trial court considered defendant's two prior convictions for which, along with the instant conviction, he was adjudicated a third-felony habitual offender. In 2004 defendant pled guilty to possession of crack cocaine, and in August 2001 he pled guilty to possession with the intent to distribute crack cocaine. The trial court noted that in connection with defendant's 2001 conviction, the sentencing judge had recommended defendant for the intensive incarceration program, with opportunities for self-betterment. The trial court also noted that three years later the sentencing judge in the 2004 conviction had given defendant three years active probation, with the condition that defendant participate in the drug court program to help him change his lifestyle.

The trial court recounted the anguish the parents of victim Eric McCormick must have gone through, from identifying the remains of their son to going to the funeral home to commending their son to the earth, all because of defendant. The trial court also mentioned that during the trial, the State had offered defendant a plea bargain that would have resulted in a sentence of twenty-five years imprisonment, which figure was subsequently reduced to twenty years. The trial court specifically noted that although the victim's parents had agreed to each plea bargain deal, the defendant had rejected them. Finally, the trial court noted a lack of any remorse in defendant for what he had done.

In State v. Walker, 99-2868 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, this court found that an eighty-year sentence imposed on a second-felony habitual offender convicted of manslaughter was not unconstitutionally excessive. The defendant in Walker had confessed to strangling a woman he had picked up and smoked crack and had sex with, after she had allegedly began hitting and pushing him when he informed her he had no more money or crack. As in the instant case, the defendant in Walker had been tried for second-degree murder, but the jury had found him guilty of the lesser offense of

manslaughter. In <u>Walker</u>, the defendant's one prior conviction was for theft valued at more than five hundred dollars.

In <u>State v. Hopkins</u>, 34,119 (La.App. 2 Cir. 12/20/00), 774 So.2d 1178, the court found that a mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence imposed on a third-felony habitual offender convicted of manslaughter was not unconstitutionally excessive. The defendant in <u>Hopkins</u> had shot and killed an individual in the course of robbing the individual of illicit drugs. One of the defendant's prior convictions was a plea of guilty to simple robbery, the other was unknown.

In the instant case, defendant returned to the scene of the earlier confrontation apparently motivated by a desire to either continue the fight and/or to exact revenge upon those who had "won." The sentencing judge was obviously influenced by defendant's seeming lack of remorse for such a cavalier killing. Additionally, defendant apparently had not taken advantage of the opportunities for rehabilitation that were afforded him after his two prior drug convictions. Under these circumstances, the extended sentence of imprisonment is not needless and purposeless, but negates defendant's opportunity to commit similar violent crimes in the future. We cannot say that the sentence makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, or is grossly out of proportion to the severity of the crime. Thus, we conclude that that the defendant's sentence is not unconstitutionally excessive.

We therefore reject this assignment of error.[16]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[17]

To the extent petitioner is arguing that his sentence is excessive or otherwise inappropriate under Louisiana law, the claim is not cognizable in this federal proceeding. As previously noted, federal *habeas corpus* relief is available only for violations of federal

---

[16]  <u>Van Buren</u>, 2009 WL 8684645, at *4-8; State Rec., Vol. I of III.

[17]  <u>State v. Van Buren</u>, 23 So.3d 913 (La. 2009) (No. 2009-K-0823); State Rec., Vol. III of III.

constitutional law and, therefore, this Court does not sit to review alleged errors of state law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, this Court will not review the state court's findings regarding the propriety of petitioner's sentence under state law. See, e.g., Smith v. LeBlanc, Civ. Action No. 05-2847, 2007 WL 1030235, at *10 (E.D. La. Mar. 28, 2007).

Further, to the extent that petitioner is contending that his sentence is excessive under the Eighth Amendment of the United States Constitution, his claim clearly has no merit. In Solem v. Helm, 463 U.S. 277, 284 (1983), the Supreme Court held that the Eighth Amendment "prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed." "This constitutional principle is tempered, however, by the corollary proposition that the determination of prison sentences is a legislative prerogative that is primarily within the province of legislatures, not courts." United States v. Gonzales, 121 F.3d 928, 942 (5th Cir. 1997) (citing Rummel v. Estelle, 445 U.S. 263, 274-76 (1980)). "[C]ourts must grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes." Gonzales, 121 F.3d at 942 (quotation marks omitted). "[T]herefore, it is firmly established that successful challenges to the proportionality of punishments should be exceedingly rare." Id. (quotation marks omitted).

Interpreting Solem in light of intervening precedent, the United States Fifth Circuit Court of Appeals has set forth the framework to be used when analyzing a claim that a sentence is excessive:

> [W]e will initially make a threshold comparison of the gravity of [petitioner's] offenses against the severity of his sentence. Only if we infer that the sentence is grossly disproportionate to the offense will we then ... compare the sentence received to (1) sentences for similar

crimes in the same jurisdiction and (2) sentences for the same crime
in other jurisdictions.

McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992). Moreover, when evaluating the

excessiveness of a sentence imposed under a habitual offender statute, a court must be mindful that

the "sentence is imposed to reflect the seriousness of [petitioner's] most recent offense, not as it

stands alone, but in the light of his prior offenses." Id.

      The Fifth Circuit has noted that Rummel v. Estelle, 445 U.S. 263 (1980), "establishes

a benchmark for disproportionate punishment under the Eighth Amendment." Gonzales, 121 F.3d

at 943. In Rummel, the Supreme Court upheld a petitioner's sentence to life imprisonment for

obtaining $120.75 under false pretenses. The sentence was imposed under a Texas recidivist statute

and took into account petitioner's prior convictions for fraudulent use of a credit card and passing

a forged check. The Fifth Circuit observed:

> We acknowledge that the distinction between constitutional sentences
> and grossly disproportionate punishments is an inherently subjective
> judgment, defying bright lines and neutral principles of law.
> Nevertheless, we can say with certainty that the life sentence
> approved in Rummel falls on the constitutional side of the line,
> thereby providing a litmus test for claims of disproportionate
> punishment in violation of the Eighth Amendment.

Gonzales, 121 F.3d at 943 (footnote omitted).

      In light of the Rummel finding that a life sentence was not excessive when imposed

for a *nonviolent* offense where the habitual offender had two prior nonviolent offenses, all of which

were relatively minor offenses, this Court cannot conclude that petitioner's eighty-year sentence as

a third offender for the grave crime of manslaughter was grossly disproportionate. In that the

sentence was not grossly disproportionate, this Court's "inquiry is finished." Gonzales, 121 F.3d

at 942.  Because petitioner's sentence was not so excessive as to violate the United States Constitution, this claim must fail.

Out of an abundance of caution, the Court notes that petitioner also contends that the trial judge's "highly emotional diatribe" during sentencing was inappropriate.  At sentencing, the judge lamented the devastating effects of violence on the neighborhood where this crime occurred. To the extent that petitioner may be claiming that relief is warranted based solely on those comments, he is incorrect.  Where, as here, the comments did not stray into a clearly forbidden area (such as the petitioner's race, religion, or political opinions, for example), a petitioner is not entitled to relief merely because the judge's comments at sentencing were irrelevant or intemperate.  See Sandoval v. Acevedo, 996 F.2d 145, 151-52 (7th Cir. 1993) ("Although the accuracy, relevance, and tone of the judge's remarks in sentencing Sandoval can be questioned, Sandoval points to no principle of constitutional law that would authorize a federal court to invalidate an otherwise lawful and constitutionally proper sentence because it did not appear to be the product of informed, measured consideration.  It is not suggested that the judge took the defendant's race, religion, or political opinions, or any other forbidden ground for punishment into account in determining the sentence.").

## C.  Ineffective Assistance of Counsel

Lastly, petitioner claims that his trial counsel was ineffective.  The United States Supreme Court has established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697

(1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

To prevail on the prejudice prong of the Strickland test, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  In this context, a reasonable

probability is "a probability sufficient to undermine confidence in the outcome." Id. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

In the instant case, petitioner claims that his counsel was ineffective for failing to inform the court that the state had not provided the defense with a requested statement of Yacanette Nixon. In the state post-conviction proceedings, the district court rejected that claim, holding:

> In Strickland v. Washington, 466 U.S. 668 (1984), the United States Supreme Court held that the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result". Id. at 669. In particular, the defendant must show that his representation fell below an objective standard of reasonableness *and* that but for counsel's errors, the result(s) of the trial would have been different. Id.
>
> ....
>
> ... [P]etitioner claims that counsel did not tell the Court that the State failed to turn over exculpatory evidence prior to trial. Particularly, Petitioner asserts that the State did not turn over a taped statement from one of the State's witnesses, Ms. Nixon. Petitioner argues that the tape would have aided him in that the jury would have been able to hear that her statement was given in exchange for leniency. According to Brady, the prosecutor may not suppress evidence which is favorable to the defendant and material of the issue of defendant's guilt or innocence. Brady v. Maryland, 373 U.S. 83 (1963). Favorable evidence includes both exculpatory evidence and impeachment evidence. Id. Furthermore, the "evidence is material if there is a reasonable probability, sufficient to undermine confidence in the outcome, that the evidence, if disclosed to the defense, would have changed the outcome of the proceeding or created a reasonable doubt that did not otherwise exist". United States v. Bagley, 473 U.S. 667 (1985). Petitioner does not assert, nor is there any reason for this Court to believe, that the admission of the tape would have changed the outcome of the proceeding or created reasonable doubt. Moreover, this tape, if such tape existed, cannot

be classified as exculpatory in that it has not been proven to this Court that this tape would tend to prove the defendant's guilt or innocence. As a result, this claim is without merit without further proof.[18]

The Louisiana Fourth Circuit Court of Appeal likewise denied relief, holding:

> [T]he relator argues that his counsel was ineffective because he did not notify the court when the state failed to provide the defense with a recorded statement made by a witness, Ms. Yacanette Nixon. As proof that such a statement exists, the relator attaches one page of a discovery motion filed by defense counsel in which counsel indicates that Detective Barbe noted in his [sic] incident report that Ms. Nixon made a blatant attempt to trade evidence in the case at hand in exchange for favorable treatment for an arrested person named Fermin Santiago. Defense counsel's motion shows only that Ms. Nixon called Detective Barbe; there is no evidence that a formal statement was ever recorded. Therefore, we deny this claim on the showing made. La. C.Cr.P. art. 930.2.[19]

The Louisiana Supreme Court then also denied relief without assigning additional reasons.[20]

Petitioner has, indeed, failed to meet his burden of proof with respect to this claim in several respects.

First, petitioner's only evidence in support of his claim is a single page taken from what he purports was a pretrial motion filed by defense counsel referencing a taped statement of Ms. Nixon. However, it is unclear whether that page is authentic, in that no such motion appears in the

---

[18]  State Rec., Vol. I of III, Judgment dated January 19, 2011.

[19]  State v. Vanburen, No. 2011-K-0290 (La. App. 4th Cir. Mar. 23, 2011); State Rec., Vol. III of III.

[20]  State ex rel. Vanburen v. State, 84 So.3d 563 (La. 2012) (No. 2011-KH-0876); State Rec., Vol. III of III.

state court record. No evidence of the existence of either the motion or a taped statement from Ms. Nixon has ever been offered.

Second, even if the motion is authentic and the taped statement actually existed, petitioner has produced no evidence whatsoever, such as an affidavit from trial counsel, to establish that the tape recording was not in fact produced between the time the purported motion was filed and the start of trial.

Third, even if the tape recording was not in fact produced prior to trial, defense counsel obviously possessed at least a transcript of the statement before trial, in that he quoted from it in the purported motion.[21] Therefore, defense counsel was clearly aware of the contents of the statement and could have used that information to question Ms. Nixon concerning her motivation, and to impeach her if necessary, if he was inclined to do so at trial.

Fourth, in any event, petitioner has failed to prove that he was prejudiced by defense counsel's failure to raise the issue of the tape at trial and/or his failure to question (and, if necessary, impeach) Ms. Nixon concerning her purported motivation for implicating petitioner. It was Joseph Nixon, III, *not* Ms. Nixon, who was the eyewitness to the actual shooting; therefore, *he* was the crucial witness at trial. Although Ms. Nixon heard petitioner's threats, those same threats were

---

[21] The motion states:

> 8. In the final exchange of her taped statement to the police, given on January 18, 2007, while her nephew Fermin Santiago languished in jail awaiting the prosecutor's charging decision in a murder case, Ms. Nixon is asked whether there is anything that she wishes to add. She responds: "I just hope you consider that child and give him a little break."

Rec. Doc.1-2, p. 61.

established through the trial testimony of Robin Pruett, and so Ms. Nixon's testimony on that point was simply cumulative. Therefore, even if the counsel had raised the issue and the trial judge had required the state to produce the actual tape recording, and even if the recording had then been used to question and impeach Ms. Nixon, her testimony was hardly critical in this case. In light of that fact, there is simply no reasonable probability that, had those things occurred, the result of this proceeding would have been different.

For all of these reasons, the Court finds that petitioner has failed to prove either that counsel performed deficiently or that prejudice resulted. His ineffective assistance of counsel claim therefore fails on both prongs of the Strickland analysis and should be rejected.

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Wilbert Van Buren be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[22]

---

[22] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.

New Orleans, Louisiana, this second day of January, 2013.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**